*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| CLARK J., | ) | |
| | ) | Supreme Court No. S-17797 |
| Appellant, | ) | |
| | ) | Superior Court Nos. 3GL-16-00002/ |
| v. | ) | 00003/00004 CN (Consolidated) |
| | ) | |
| STATE OF ALASKA, | ) | O P I N I O N |
| DEPARTMENT OF HEALTH & | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | No. 7513 – April 2, 2021 |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Glenallen, Rachel Ahrens, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. Anna Jay, Assistant Attorney General, Anchorage, and Clyde "Ed" Sniffen, Jr., Acting Attorney General, Juneau, for Appellee. Laura Hartz, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices. [Borghesan, Justice, not participating.]

CARNEY, Justice.

## I.   INTRODUCTION

The Office of Children's Services (OCS) took custody of three Indian children[1] after reports of substance abuse and domestic violence in their mother's home. For two years OCS was unable to contact the children's father, who also struggled with substance abuse issues. Once OCS did contact the father, both he and the mother consented to temporarily place the children with a guardian. OCS then reduced its efforts to reunify the children with their father.

The children's mother died. The father was incarcerated for several months; he completed classes and substance abuse treatment. After he was released, he maintained his sobriety and began limited contact with OCS and with his children.

Approximately four years after taking custody of the children, OCS moved to terminate the father's parental rights. After the superior court terminated his rights, the father appealed. He argues that OCS failed to make active efforts to reunify him with his children as required by ICWA. We agree and reverse the termination of his parental rights.

---

[1]   The Indian Child Welfare Act (ICWA) defines "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member in an Indian tribe." 25 U.S.C. § 1903(4) (2018).

## II.    FACTS AND PROCEEDINGS

### A.    Background

Clark J.[2] is the father of Antoine, Oona, and Jenna. The children's mother, Melina B., died in April 2019. The children are members of Melina's tribe.[3] OCS received several reports concerning the family between 2005 and 2014, and for a time the children were in tribal custody.

In January 2016 the children were living with their mother in Chitina. OCS removed the children from Melina after receiving reports she was abusing alcohol and engaging in domestic violence with her mother. OCS was unable to contact Clark. In February 2016 the superior court granted OCS's petition for temporary custody of the children. In May Melina stipulated that the children were in need of aid, and in December she stipulated to OCS custody for a period not to exceed two years. Eventually the children were placed in the care of Melina's relative.

For the first two years that OCS had custody of the children, Clark was not involved. Clark later testified that he learned his children were in OCS custody in July 2016, but that he did not get involved in the case because Melina told him "that she had everything under control and that if [Clark] had any involvement it would just only make things harder because [Clark and Melina] weren't together at the time." OCS was unable to contact Clark during that time. Clark did not visit the children, but he had some phone contact with the children when Melina visited them.

In early 2018 OCS was able to reach Clark through Facebook. In January 2018 OCS petitioned to terminate both parents' parental rights. Clark appeared at a

---

[2]     Pseudonyms are used to protect the privacy of the parties.

[3]     Melina was enrolled in the Gwichyaa Zhee Gwich'in Tribe. The children are therefore Indian children under ICWA. *See* 25 U.S.C. § 1903(4).

permanency hearing in February 2018 — the first time he had participated in the case. Both parents later consented to a relative's guardianship of the children, and OCS abandoned its effort to terminate parental rights. In February 2019 the court held another permanency hearing, which Clark did not attend; the court made provisional permanency findings which it later adopted, including a finding that OCS had made active efforts to reunify the family.

Clark was incarcerated from March to May 2018. Although OCS sent him a letter in April, Clark did not recall receiving one while he was in jail. For over a year Clark had no further contact with OCS; then Clark initiated contact.

Melina died in April 2019. Shortly afterwards, Clark saw the children at Melina's mother's apartment and then at Melina's funeral. Clark was arrested and incarcerated in June. While incarcerated, he completed a parenting class and attended weekly Alcoholics Anonymous meetings. He was released from jail in August and began a three-month inpatient substance abuse program.

Around this time he began monthly contact with OCS. The OCS caseworker who had been assigned to the case since March 2016 first discussed Clark's case plan with him while he was in treatment in October, over three years after OCS took custody of the children. Clark's case plan required him to "be compliant with criminal, court, facility & probation requirements," "live a healthy & sober lifestyle," and "develop & maintain a bond with his children." At the end of October, OCS noted that Clark had made some progress on each of the goals.

Clark had some phone contact with the children between his release and the trial, and he sent them one letter. He did not respond to a letter the children sent back to him.

## B. Termination Trial

In January 2020 OCS again petitioned to terminate parental rights. At trial in March OCS called four witnesses: the children's guardian, Clark, an ICWA expert, and the assigned caseworker. The guardian testified generally about the children and their limited contact with their father. Next OCS called Clark.

Clark admitted that he had had "a problem with alcohol" for many years. He testified that he was now sober, attended Alcoholics Anonymous meetings regularly, and had been in outpatient treatment until he took "a pause" to take care of his newborn son. He testified that while incarcerated, he had completed classes including a parenting class and anger management classes. He explained he had chosen to enter substance abuse treatment after his release from jail and had been sober since June 1, 2019, although he acknowledged that he occasionally continued to use marijuana. He testified that he had made changes in his life because he wanted to be part of his children's lives and "would like . . . a chance to be — to be their father."

After calling Clark, OCS presented testimony from a social worker who had reviewed OCS's records to satisfy ICWA's requirement for expert testimony "that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[4] The OCS expert opined that the children "would likely suffer serious physical or emotional harm if returned to [Clark's] care."

OCS's final witness was the assigned caseworker, who testified about her involvement with the family and the efforts taken to reunite Clark with his children. She explained that she had been unable to locate Clark when she was first assigned to the case. She testified that according to her notes, she first tried to search for relatives that

---

[4]     25 U.S.C. § 1912(f).

could care for the children in 2017. She contacted individuals in Chitina as well as the Chistochina tribe, with which she had heard Clark was affiliated. She also asked if any of them knew Clark or had recently had contact with him, but acknowledged that she was not successful. She also testified that she contacted state troopers, who had an arrest warrant for Clark; Clark's girlfriend, who did not acknowledge that she knew him; and Clark's father; and his cousin. The caseworker testified that she continued to search unsuccessfully for Clark throughout 2017, and that the children's mother did not share much information about him.[5]

The caseworker testified that she reached Clark via Facebook in early 2018 and sent a letter to him in jail in April. She stated that Clark did not reply to her letter, and that she made a case plan but did not discuss it with him until over a year later in October 2019. After she went over the case plan with him, Clark contacted her each month.

On cross-examination the caseworker admitted that she had not consistently kept written notes of her contacts in the case as she was required to do by law.[6] She also acknowledged that although she knew Clark was on probation and at times in jail, she did not attempt to locate him through databases that were available to her to locate incarcerated people because she did not know about them.

The caseworker testified that after Clark consented to guardianship for the children, she further reduced her attempts to locate him because she did not understand that OCS had a continuing obligation to make active efforts. She also admitted that she

---

[5] Clark later acknowledged that he avoided contact with OCS because of the warrant.

[6] *See* 25 C.F.R. § 23.120(b) (2018) ("Active efforts must be documented in the record.").

did not create a family contact plan even though Clark was requesting more contact with his children. And she stated that instead of setting up a schedule of phone calls between Clark and his children, she gave him the number for the Court Appointed Special Advocate (CASA)[7] working with the guardian ad litem on the case, and told him "to work that out with her." She acknowledged that she did not set up drug testing or parenting classes for Clark. The caseworker attributed her failure to document her efforts in the case to being "very new and inexperienced" and having been assigned an "overwhelming" number of cases.

Clark testified on his own behalf and also called an investigator from his attorney's office. The investigator testified about some of the online systems available to both the public and state agencies to locate individuals involved with the Department of Corrections (DOC) and law enforcement agencies.

## C. Termination Order

In May 2020 the superior court terminated Clark's parental rights. The court found that the children were in need of aid as a result of Clark's abandonment and substance abuse.[8] It noted that "[t]his was not a close question," because Clark "made no effort to provide support or make meaningful communication for approximately two years" and his struggles with alcohol had led to three DUI convictions.

---

[7] A CASA is a "volunteer trained and supervised by professional program staff to speak up for abused and neglected children in child welfare court cases." *Who We Are: Frequent Questions*, ALASKA CASA, https://www.alaskacasa.org/who-we-are/frequent-questions.html (last visited Mar. 22, 2021). CASA volunteers work under the supervision of the assigned guardian ad litem in child in need of aid (CINA) cases. *Id.*

[8] *See* AS 47.10.011 subsections (1) (abandonment) and (10) (substance abuse).

The court also found that OCS had made active efforts to reunify the family, but described its finding as "a very close call" because "OCS could have done a better job at making active efforts in the 24 months immediately preceding this trial." The court relied in part on Melina's stipulation to active efforts in 2016 and its active efforts findings in February 2018 and in April 2019. The court observed that "the State's efforts to reunite him with the children became less active" after Clark agreed to guardianship, but found active efforts based upon OCS's efforts before then. And finally the court determined that termination of Clark's parental rights was in the children's best interests.

Clark appeals, arguing that OCS did not make active efforts to reunify him with his children and that the court's finding of active efforts tainted its other findings under ICWA.

## III. STANDARD OF REVIEW

"Whether the state complied with the 'active efforts' requirement of [ICWA] is a mixed question of law and fact."[9] "[W]e review the trial court's factual findings for clear error and its legal determinations de novo."[10] "We will find clear error only when a review of the entire record leaves us 'with a definite and firm conviction that the superior court has made a mistake.' "[11]

---

[9] *Jude M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 394 P.3d 543, 550 (Alaska 2017) (alteration in original) (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

[10] *Id.* (quoting *Emma D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 322 P.3d 842, 849 (Alaska 2014)).

[11] *Id.* (quoting *David S. v. State, Dep't of Health & Soc. Servs., Office of*
(continued...)

## IV.    DISCUSSION

Clark first argues that OCS failed to make active efforts to reunify his family as required by ICWA.[12]  He also argues that OCS failed in its separate obligation to document active efforts.  Finally he argues that the court's active efforts determination "tainted" its other findings, "render[ing] suspect" its findings that Clark had not remedied his conduct, that reunification posed a substantial risk of harm, and that termination was in the children's best interests.

### A.    OCS Failed To Satisfy ICWA's Active Efforts Requirement.

Clark argues that OCS failed to meet its active efforts requirement in either the first two years of the case or the second two years.[13]  He points out that OCS failed to even draft a case plan for him until April 2018.  He also argues that OCS failed in its separate duty to document its efforts.

---

[11]    (...continued)
*Children's Servs.*, 270 P.3d 767, 774 (Alaska 2012)).

[12]    25 U.S.C. 1912(d) (requiring a party seeking termination of parental rights to an Indian child to "satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful").

[13]    The superior court's termination order referred to both "reasonable efforts" and "active efforts."  All cases involving Indian children are subject to ICWA's more stringent "active efforts" requirement.  *Id.*  We express no opinion about whether the court's apparent confusion about the proper level of effort required of OCS may have influenced its "very close call" finding active efforts.  We take this opportunity, however, to emphasize that "active efforts" to reunify the Indian family are required in every ICWA case and that courts may not substitute the lower "reasonable efforts" requirement of non-ICWA cases.  *See Kylie L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 407 P.3d 442, 448 n.6 (Alaska 2017) (noting the "active efforts" standard is more demanding than the "reasonable efforts" standard).

ICWA defines active efforts as "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family."[14] When analyzing whether the State has made these active efforts, courts may consider services provided by state agencies other than OCS, including DOC.[15] OCS efforts are not active "where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition," but rather where the "caseworker takes the client through the steps of the plan."[16] It was clear error for the superior court to determine that OCS made active efforts to reunify Clark with his children.

### 1. It was error to rely upon Melina's stipulations.

The superior court based its active efforts finding in part on Melina's stipulations and findings during earlier hearings.[17] Melina stipulated to "[a]ctive and reasonable efforts" in May 2016, and again in December 2016, in her stipulation to

---

[14]     25 C.F.R. § 23.2 (2020).

[15]     *Denny M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 365 P.3d 345, 350 (Alaska 2016).

[16]     *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 271 (Alaska 2011) (quoting *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 235 P.3d 203, 213 (Alaska 2010)).

[17]     The active efforts finding from February 2018 cited "substance abuse assessment/treatment; random UAs; efforts to locate; transportation assistance to attend services; developing/updating case plan, family contact." The only listed effort that could have pertained to Clark, who had not been involved in the case until the February 2018 hearing, would have been the attempts to locate him. Similarly the April 2019 active efforts finding listed substance abuse assessment/treatment, transportation assistance, random drug testing, and family contact, but only family contact appears to apply to Clark. The caseworker did not set up drug tests for him, and Clark testified that he sought out substance abuse treatment himself. And there is no indication in the record that OCS ever assisted Clark with transportation.

continued OCS custody. Clark never stipulated to active efforts. He did not get involved in the case until February 2018. Clark did consent to guardianship in May 2018, but the document he signed did not mention active efforts. Clark cannot be bound by stipulations to which he is not a party. It was error for the superior court to rely upon Melina's stipulations to find that OCS made active efforts to reunify Clark with the children. While the superior court may consider findings from hearings in which Clark participated, those findings are not dispositive.

### 2. OCS made active efforts for the first two years of the case.[18]

Clark first argues that OCS failed to make active efforts to reunite him with his children during the first two years of the case. But he "concedes that the state actively engaged with Melina and with the children." And he acknowledges that he "was not eager to engage with OCS" both because Melina had recommended against his involvement and because he was avoiding arrest.

In *Dashiell R. v. State, Department of Health & Social Services, Office of Children's Services*, we upheld a finding of active efforts where "the state's efforts were heavily oriented towards the mother" and the state directed fewer efforts towards the father, who was unavailable because he was incarcerated.[19] We reasoned that "had the children been able to stay with the mother, who was not incarcerated, there is no

---

[18] Like the superior court and the parties, we consider the active efforts in two parts: the first two years, before the caseworker contacted Clark via Facebook; and the second two years, from her early 2018 message to Clark through the 2020 termination of parental rights.

[19] 222 P.3d 841, 849 (Alaska 2009).

indication [the father's] parental rights would have been terminated."[20] There is no dispute that OCS made active efforts towards Melina in the first two years of this case.

As in *Dashiell R.*, OCS did make some efforts towards Clark despite his lack of participation during the first two years of the case. The caseworker attempted to find relative placements for the children by contacting the tribe she believed was Clark's and people who knew Clark, including his father and his girlfriend, who denied knowing him. The caseworker also contacted the troopers after learning there was a warrant for Clark's arrest.

Although a parent's "lack of effort does not excuse OCS's failure to make and demonstrate its efforts,"[21] a court may consider a parent's "demonstrated lack of willingness to participate" when evaluating active efforts.[22] OCS's efforts towards Clark in this period were far from perfect; for example, Clark correctly points out that OCS did not attempt to contact him over Facebook for two years, and that he immediately responded. But by his own admission, Clark had avoided OCS up to that point. OCS's "[f]ailed attempts to contact the parent . . . may qualify as active efforts if the parent's evasive or combative conduct 'rendered provision of services practically impossible.' "[23] As in *Dashiell R.*, OCS's efforts to reunify Melina with the children in the first two years

---

[20]    *Id.* at 850.

[21]    *Bill S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 436 P.3d 976, 983 (Alaska 2019).

[22]    *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008) (quoting *N.A. v. State, Div. of Family & Youth Servs.*, 19 P.3d 597, 603 (Alaska 2001)).

[23]    *Sylvia L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 343 P.3d 425, 433 (Alaska 2015) (quoting *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002)).

of the case, combined with its imperfect efforts towards Clark, are sufficient to satisfy OCS's active efforts requirement during the first two years.

Clark also argues that OCS failed to adequately document its efforts to find him, which is a separate responsibility that "is required by ICWA and is critical to compliance with ICWA's purpose and key protections."[24] The caseworker conceded that she did not always document her efforts. But the documentation and testimony she did provide are sufficient to support the superior court's finding that OCS made active efforts towards Clark, as well as towards Melina, in the first two years of the case.

### 3. OCS failed to make active efforts during the second two years of the case.

We agree with Clark that OCS failed to make active efforts in the last two years of the case. The superior court found that "OCS could have done a better job at making active efforts in the 24 months immediately preceding this trial." The court detailed OCS's failures in its termination order: the caseworker did not provide an updated case plan to Clark; did not attempt to use VINELink or ACOMS to search for him while he was incarcerated; sent one letter but did not visit him in jail; did not refer him to treatment while in custody; did not refer him to drug testing or parenting classes when he was released; and did not schedule in-person visits with his children. Despite these failures, the superior court concluded that OCS met the active efforts requirement. This was error.

As the superior court found, "once [Clark] agreed to guardianship of the children . . . [OCS]'s efforts to reunite him with the children became less active." The caseworker testified that after Clark consented to guardianship, she stopped looking for him "as much as [she] was prior to that." And when questioned about OCS's continuing

---

[24]    *Bill S.*, 436 P.3d 976, 983 (Alaska 2019).

requirement to provide active efforts after a parent consented to guardianship, the caseworker testified that she did not "really underst[an]d that fully at that time" and that her "attention was more strongly focused on Melina at that time."

In fact, the record indicates that OCS may have stopped trying to contact Clark entirely. The caseworker testified that she sent a letter to Clark after he consented to guardianship, but she also testified that she wrote the letter in April, which was before Clark consented to guardianship.[25] And there is no evidence that OCS made any effort to contact Clark between the spring of 2018 and October 2019, when Clark contacted OCS. OCS concedes its "lack of engagement with [Clark] between April 2018 and October 2019." There is no indication that OCS attempted to contact Clark even after Melina's death. It was only after Clark took the initiative to contact OCS that OCS renewed its efforts toward him.

As the superior court noted, OCS did not use VINELink or ACOMS to search for Clark, did not refer him to treatment while he was incarcerated, and "sent him one letter in jail, but never visited him there." OCS did not provide a copy of the case plan to Clark until October 2019, nearly four years after taking custody of his children.

Even after Clark initiated contact with OCS in October 2019, OCS made minimal efforts to encourage contact between him and his children. After Clark told OCS he was "frustrated by the lack of contact," the caseworker gave him the CASA's phone number to work out a telephone schedule, but did not assist him in preparing that schedule. And although OCS assisted Clark in sending a letter to the children, it never developed a family contact plan. The superior court concluded that the OCS caseworker "did not do enough to actively facilitate the goal of bonding with the children."

---

[25]     Clark maintains he never received the letter.

Although we consider the services DOC provided to Clark when we analyze active efforts,[26] those services are not enough to compensate for OCS's lack of effort in this case.[27]

OCS correctly points out that "inadequate efforts in one period of state involvement do not render the entirety of [its] efforts inadequate, even when that period lasts for a matter of months."[28] And the superior court correctly found that OCS had made active efforts to reunify Clark and his children during the first two years of the case. But OCS's failure to make adequate efforts in this case encompassed the subsequent two years, fully half of the time that the case was open. And its failure during that two year time period was extreme: OCS did not even attempt to contact Clark for a year and a half, and may have gone even longer without doing so if Clark had not initiated contact himself. OCS's failure to make active efforts in the second two years of the case was so egregious that the efforts during the earlier period cannot make up for it. Because OCS's efforts to reunite Clark with his family following his consent to guardianship were minimal at best, we reverse the superior court's finding that OCS met the active efforts requirement.[29]

---

[26]     *Denny M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 365 P.3d 345, 350 (Alaska 2016).

[27]     *See Duke S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 433 P.3d 1127, 1137 (Alaska 2018) (holding that DOC services father had arranged without OCS assistance were insufficient to make up for OCS's lack of reasonable efforts).

[28]     *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 314 P.3d 518, 528 (Alaska 2013).

[29]     Because our determination that OCS failed to make active efforts is

(continued...)

## V. CONCLUSION

The superior court's decision is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

---

[29] (...continued) dispositive, we need not address whether the superior court's active efforts finding tainted the rest of its analysis. *See* CINA Rule 10.1(b)(2) (requiring court to "postpone disposition until the court finds that active efforts have been made").